

Andrea L. Richard
Lori L. Brand
Rothgerber Johnson & Lyons LLP
2424 Pioneer Avenue, Suite 210
P.O. Box 808
Cheyenne, Wyoming 82003-0808
307/638-6262

and

Mark N. Poovey
John F. Morrow, Jr.
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One West Fourth Street
Winston-Salem, NC 27101
(336) 721-3584

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| VISION GAMING & TECHNOLOGY, INC., ) ) | |
| Plaintiff, ) ) v. ) | Civil No. 02-CV-166J |
| ) PACE-O-MATIC, INC., MICHAEL R. ) PACE, and CHRISTOPHER CUMMINGS, ) ) | |
| Defendants, ) ) v ) ) | |
| ANDRE M. HILLIOU, ) ) Third Party Defendant. ) ) | |

**DEFENDANTS, COUNTERCLAIMANTS AND THIRD-PARTY PLAINTIFFS'
OPPOSITION TO VISION'S AND MR. HILLIOU'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

-1-

## BRIEF IN RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Through counsel, Defendants, Counterclaimants, and Third-Party Plaintiffs Pace-O-Matic and Michael Pace ("Pace") hereby submit this response to Plaintiff Vision Gaming & Technology Inc.'s and Mr. Hilliou's Motion for Partial Summary Judgment, filed December 17, 2002.

## STATEMENT OF THE FACTS

Without notice to Pace by virtue of a cease & desist letter or otherwise, Vision filed the underlying lawsuit alleging that Pace had infringed copyrights and trademarks belonging to Vision, and had misappropriated certain unidentified "Vision trade secrets." (*See* Complaint, Filed September 13, 2002). Pace responded by denying Vision's claims of infringement and misappropriation, and raised certain affirmative defenses that will be shown to preclude Vision from recovering on any of its claims.[1]

In addition to these defenses, Pace also filed counterclaims and third party claims against Vision and its president, Mr. Hilliou, for federal unfair competition, tortious interference with prospective economic advantage or business expectancy, and unlawful deceptive trade practices under W.S. § 40-12-101 et seq. (*See* Answer, Counterclaims, and Third Party Complaint, Filed October 7, 2002). Pace's unlawful deceptive trade practices claim under W.S. § 40-12-101 is at issue in the present Motion.

As detailed in the counterclaims and third-party complaint, Pace's claims are based in large part on Pace's belief that Vision and Mr. Hilliou have "[M]ade inaccurate statements to the

---

[1] For example, Pace correctly alleged that Vision's copyright infringement claims had to be dismissed as a result of Vision's failure to meet jurisdictional prerequisites established by the Copyright Act. (*See* Pace's Answer, at Affirmative Defense # 2) (See Pace's Motion to Dismiss Plaintiff's Copyright Infringement Cause of Action, Filed October 16, 2002). In response, Vision was forced to admit that it filed copyright infringement claims prior to meeting those prerequisites, and requested that the Court dismiss those claims without prejudice. (See Plaintiff's Response to Motion to Dismiss, Filed October 30, 2002). Pace believes the present motion is nothing more than an ill-founded attempt to somehow even the score.

relevant marketplace concerning the game designers and software engineers employed by Vision, in a manner that is deceptive and misrepresents the source of Vision's and Pace's games and software, as well as Vision's and Pace's ability to engineer and develop new games and software." (*See* Counterclaims and Third Party Complaint, at ¶ 10). As concerns the unlawful deceptive trade practices claim, Pace alleged that such acts "constituted a misrepresentation that Vision's and/or Pace-O-Matic's goods have a source, origin, sponsorship, or approval which they do not have," and that such acts "constituted a misrepresentation that Vision and/or Mr. Hilliou have a sponsorship, approval or affiliation which they do not have." (*Id.* at ¶¶ 24-25). As detailed below, such acts fall squarely within those precluded by Wyoming's Consumer Protection Act, W.S. § 40-12-101 et seq., and Vision's and Mr. Hilliou's Motion should be thus be denied in all respects.

## ARGUMENT

**A.    Vision's and Mr. Hilliou's Alleged Unlawful And Deceptive Acts Are Prohibited By Wyoming's Consumer Protection Act.**

Wyo. Stat. § 40-12-105(a)(i) specifically provides that an unlawful and deceptive practice includes one in which a person or entity "[R]epresents that merchandise has a source, origin, sponsorship, approval, accessories or uses it does not have." *See* W.S. § 40-12-105(a)(i). Although conveniently ignored by Vision's and Mr. Hilloiu's motion papers, in its counterclaim and third party complaint Pace specifically alleges that Vision and Mr. Hilliou have "[M]ade inaccurate statements to the relevant marketplace concerning the game designers and software engineers employed by Vision, in a manner that is deceptive and misrepresents the source of Vision's and Pace's games and software, as well as Vision's and Pace's ability to engineer and develop new games and software." (*See* Counterclaims and Third Party Complaint, at ¶ 10).

-3-

Such acts clearly fall within those prohibited by Wyoming's Consumer Protection Act. Wyo. Stat. § 40-12-105.

At this early stage (and without discovery from Vision or Mr. Hilliou), Pace has already accumulated strong evidence that such unlawful and deceptive acts have occurred. For example, in an interview with "North American Casino" magazine, Mr. Hilliou and Vision misrepresented to an individual named Melanie Dellas that Vision has the same game designers, software engineers, and architects that worked for its predecessor in interest, Leisure Time Technologies, and that designed the Pot-O-Gold software and gaming system now sold by Vision.[2] This statement was recorded and published by the magazine in May 2002. (Exhibit A, May 2002 North American Casino Article).

The truth of the matter, however, is that Vision does not and cannot dispute that Michael Pace was the principal creator and designer of the Pot-O-Gold software and gaming system now sold by Vision (and referenced in the article), which Mr. Pace later sold to Leisure Time Technologies as part of the sale of his former company. Further, Vision and Mr. Hilliou know full well that Mr. Pace has never worked for Vision in any capacity, and certainly did not do so in May 2002. Accordingly, Mr. Hilliou and Vision have misrepresented to an individual that Vision's merchandise "has a source, origin, sponsorship, approval, accessories or uses it does not have." Such acts are specifically prohibited by W.S. § 40-12-105(a)(i), regardless of how Vision and Mr. Hilliou would like to characterize the ultimate sales of their video games.

With respect to that characterization, Vision and Mr. Hilliou contend that their misdeeds could not be prohibited by the statute because, in their narrow view, sales of their games do not

---

[2] Mr. Hilliou's and Vision's intent in making this misrepresentation was obviously to deceive consumers into believing that Vision still employs those who were responsible for creating the Pot-O-Gold software and gaming system, so that such consumers who liked Pot-O-Gold would continue to purchase products from Vision instead of its competition.

constitute "consumer transactions." (*See* Vision's and Mr. Hilliou's Supporting Brief, at pp. 3-4). However, contrary to that narrow construction, W.S. § 40-12-105(a) provides that: "a person engages in a deceptive trade practice unlawful under this act when, in the course of his business and *in connection with* a consumer transaction, he knowingly:

> (i) Represents that merchandise has source, origin, sponsorship, approval, accessories or use it does not have;
>
> (ii) Represents that he has a sponsorship, approval, or affiliation he does not have. . .

W.S. § 40-12-105(a) (emphasis added).

Vision and Mr. Hilliou essentially request that the Court redact the words "in connection with" from the statute and determine that because they purportedly do not sell their games directly to individual consumers in Wyoming, the Act does not apply and cannot regulate their conduct. Vision's and Mr. Hilliou's argument ignores the fact that the Wyoming Consumer Protection Act must be liberally construed to effect its purpose of protecting consumers from deceptive marketing practices. *See Herrig v. Herrig*, 844 P.2d 487, 495-96. (Wyo. 1992) ("[T]he Wyoming Consumer Protection Act was drafted primarily to protect consumers from unscrupulous and fraudulent marketing practices."). Moreover, despite Vision's and Mr. Hilliou's unsupported claims, individual consumers, including Wyoming consumers, have undoubtedly utilized the deceptively advertised gaming machines in question for personal purposes. Such individuals, have thus been harmed by Vision's and Mr. Hilliou's misrepresentations made "in connection with consumer transactions."[3] Accordingly, Vision and Mr. Hilliou have failed to show that as a matter of law the Wyoming Consumer Protection Act does not apply to their acts, and the Motion should be denied.

---

[3] Indeed, Michael Pace is himself a Wyoming resident who has likely been harmed by Vision's and Mr. Hilliou's misrepresentations.

**B.    To Date, Vision Has Refused To Provide Discovery On Issues Raised In The Motion.**

The Motion should also be denied because to date Vision has avoided providing discovery to Pace on issues raised in the Motion. Although Vision filed this Motion on December 17, the next day it called Pace to request additional time to respond to Pace's outstanding discovery requests - - without informing Pace that the Motion existed or had been filed. Prior to receiving the Motion (which was served by mail), counsel for Pace agreed to the extension, and as a result, the Court extended Vision's time for responding to Pace's discovery. (Exhibit B, December 19, 2002 Letter from John Morrow to James McCarthy) (*See also,* Minute Order, Dated December 18, 2002). Accordingly, at this time Vision has successfully avoided providing discovery to Pace that may shed significant light on the nature and extent of their unlawful trade practices.[4] Pace respectfully contends that under these circumstances the underlying Motion is premature, and at a minimum, Vision should be required to provide discovery on issues pertinent to their Motion. *See* Fed .R. Civ. P. 56(f).

**C.    The Formal Notice And Cure Requirement Should Not Apply To Unlawful Practices Raised As Counterclaims.**

Pace was forced to file its counterclaim for unlawful and deceptive trade practices prior to sending formal written notice and a request for cure (as contemplated by W.S. § 40-12-108) because Pace believed the counterclaim to potentially be compulsory. If Pace was forced to send notice and a request to cure fifteen days prior to asserting the counterclaim, and such counterclaim was later determined by the Court to be compulsory, Pace could have lost the claim

---

[4] For example, where, when and to whom Vision and Mr. Hilliou made misrepresentations concerning their products and employees. Pace's Request for Production No. 6 seeks "[C]opies of all published or non-published articles discussing Vision, Vision's work force, or Vision's software/gaming development capabilities." (Exhibit C, Pace's First Set of Requests for Production of Documents, at Request Nos. 6 and 58). Such articles may contain additional misrepresentations like those made in the North American Magazine article referenced above. Similarly, Vision and Mr. Hilliou have avoided providing discovery that will show where and to whom their products are marketed and sold, both of which are issues raised by the underlying Motion. (*See* Vision's and Mr. Hilliou's Proposed Findings of Fact Nos. 5, 6 and 7, and Proposed Conclusions of Law Nos. 3, 4, 5 and 14 ).

forever. Under these circumstances, Pace respectfully contends that dismissing its counterclaim for failure to meet the notice and cure provisions would undermine the true intent of the statute. Indeed, such a dismissal would mean that no counterclaim could ever be based on the Act unless the claimant had fortuitously noticed the claim prior to being sued by the recipient of the notice.[5]

**D.     If The Court Acts On The Motion, At Most Pace's Claim Should Be Dismissed Without Prejudice.**

Although Pace believes that Mr. Hilliou and Vision are entitled to no relief on the Motion, Pace contends that a more appropriate remedy than summary judgment would be to order dismissal of Pace's claim without prejudice to refile now that it is clear that Mr. Hilliou and Vision have no intent to cure their alleged unlawful and deceptive acts. Under this scenario, the Counterclaim and Third Party Complaint would constitute formal notice of the claim which has not been cured within fifteen days.

## CONCLUSION

For the aforementioned reasons, Pace respectfully requests that the Court deny Vision's and Mr. Hilliou's Motion in all respects.

DATED this 7th day of January, 2003.

Andrea L. Richard
ROTHGERBER JOHNSON & LYONS, LLP
One Pioneer Center
2424 Pioneer Avenue, Suite 210
Cheyenne, Wyoming 82001-3076
Telephone:    307-638-6262

---

[5] Pace further submits that its Counterclaim and Third Party Complaint could serve as the notice, and Vision and Mr. Hilliou have done nothing to attempt to cure their acts since receiving same months ago.

and

John F. Morrow, Jr.
WOMBLE CARLYLE SANDRIDGE & RICE,
PLLC
One West Fourth Street
Winston-Salem, NC  27101
Telephone:     (336) 721-3584

Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 7th day of January, 2003, a true and correct copy of the foregoing documents was served  by depositing same in the United States Mail, postage prepaid, addressed to:

Gary R. Scott
Hirst & Applegate
Post Office Box 1083
Cheyenne, WY  82003-1083

James F. McCarthy, III
Katz, Teller, Brant & Hild
2400 Chemed Center
255 East Fifth Street
Cincinnati, OH  45202-4787

Of: Rothgerber Johnson & Lyons LLP

-8-

# EXECUTIVE Q&A:
# ANDRE HILLIOU



By Melanie Dellas

**W**e all remember Leisure Time Technology. Its Pot-O-Gold product line has been one of the most popular video game machines for years. It also ran a series of casino cruise ships and had a hotel division. But financial and licensing troubles began to plague the company until filing for bankruptcy seemed the only route. Then in August 2000, after the resignation of Alan Johnson and the former board, a man by the name of Andre Hilliou — former CEO of American Bingo & Gaming, and prior to that CEO of Aristocrat — stepped in as president and CEO of Leisure Time Casinos & Resorts. He made some changes to the company — including its name, brought board members and investors on board, and succeeded in taking the company out of bankruptcy on March 21. The company currently holds 16 state and tribal gaming licenses. Now Vision Gaming & Technology, a privately held company, has a new vision for the future — and it includes building on the great relationship Pot-O-Gold has with the Native American market.

**Melanie Dellas: Tell me about Vision Gaming & Technology and its direction for the future.**
Andre Hilliou: The new company is basically the same as the old company. What we have is a new set of investors, board members and managers. But at the end of the day, the same people who made the company — the game designers, the software engineers and architects — remain the same. What was very strong within the company has remained the same. We're looking also at creating alliances with outsiders, such as a distributor relationship with KP Gaming in California, and game designers that will add value to our company and believe in the same philosophies we believe in. We're looking at very seasoned game designers and bringing them in as contractors to help us design games that will hopefully take

the company into the next generation of games.

We are also working with the employees and really making them part of the team. We've made most of the employees owners of the company. When you're an owner you work a little bit harder, you care more about the dollars that go out or come in.

**MD: From a manufacturing standpoint, is there anything Vision Gaming & Technology will change or do differently than Leisure Time?**
AH: The games are basically the same, and we're bringing new games to the market soon. We are establishing relationships with some Native American companies that will be representing us and are already bearing fruit. We are going to a PC-based platform, and we're coming up with some games that should be in the market in six to eight months. The Pot-O-Gold product line has been a market maker in any market it has been introduced, so we are looking at building upon that line and expanding it.

**MD: In your opinion, what skills should Native American managers possess, and what should they look out for when running their businesses?**
AH: I think the tribes have done a good job managing their casinos overall. I think, like in California, they've grown very quickly and very safely. They've been conservative and growing as the market grows. No matter what business it is, the market basically decides how and when you grow and the level of your growth. The tribes really know the markets quite well. I think within four to five years some of the Indian casinos will rival the Nevada casinos, and the market that used to go to Nevada will stay in California. Indian casinos understand and cater to the customer base really well — probably better than Nevada — because they are dealing

> "Never take the market for granted because it moves a lot. If they do not like what they see in one market, they will find it elsewhere."

**EXHIBIT**

A

with the repeat customer.

The management of the tribes is very, very savvy. I'm really amazed at how California has mastered the art of managing casinos. Understanding the market is key. Managers must understand the demand and need of the customers, and cater to those needs. For example, I believe some of the casinos in California that are not on the main thoroughfare must become destination resorts. How do you define destination resorts? Well, you look at what drives your customer base, whether it's a golf course, hotel or the like, and you deliver it. It's a must in order to keep the customers there more than eight hours. You need to keep them there for long weekends where they can enjoy your resort. Casinos are more than just the casinos themselves.

My advice to the tribes is to look at what has worked in non-Indian casinos and apply the same rules. Business is business, and the customer base doesn't realize what drives the casino, they're looking at their needs to be fulfilled. Also, never take the market for granted because it moves a lot. Much of our customer base is mobile. If they do not like what they see in one market, they will find it elsewhere.

**MD: What skills or knowledge did you take with you when you left as CEO of Showboat?**
AH: When I started to work for Steve Wynn many years ago, one thing I learned from him is that you have to understand the need of the customer and exceed those needs. What I have also learned from the Showboat is that you must do if prudently. Money is hard to come by, so before you make large financial decisions, make sure you'll get a good return on your investment. Showboat sent me to Australia as CEO of a billion-dollar property, and one thing that amazed me there was that the market went from the reel to video in five or six years because video gaming entertains you way beyond what the reel machine can do. So I believe in the U.S. within a certain period of time, five or 10 years, the market will be 90 percent or 95 percent video. The video game allows the customer to win in different ways and make various decisions with a certain amount of money that the customer is predisposed to play.

**MD: Being objective, what would you suggest to purchasing people and others who are looking at all the games out there and trying to make a decision for their facility?**
AH: At the end of the day you have to look at how the product performs on the floor. The key to it is not how hard you advertise your product, but what return you get on the investment. How long has the product been performing on the market? Many products perform very well on the market for a short period of time only. Games with a long track record will do well. You must look at the history of the games and then use that as a steppingstone to go forward. ◆



INSTALL LIVE NASCAR® GAMES

•

INCREASE TRAFFIC

•

ATTRACT THE LARGEST CUSTOMER BASE

•

9% NO RISK GUARANTEED PROFIT

•

MINIMAL CASINO INVESTMENT

•

REGULAR PLAYER'S PARTIES WITH HATS, SHIRTS AND SOUVENIRS

•

After three years of development, BetRacer Network, Inc. has introduced a Pari-mutuel wagering network for real time wagering on NASCAR® races. NASCAR® fans are extremely loyal and number over 100 million fans worldwide.

Machines are available for immediate installation in California, Florida, New Mexico and other Parimutuel jurisdictions.

Call 1-800-467-1774 for an appointment or visit the BetRacer Network Inc. Hospitality Suite at the Marriott Marina Hotel on April 25 & 26th. See Information Board for Suite Number





**WOMBLE
CARLYLE
SANDRIDGE
& RICE**

A PROFESSIONAL LIMITED
LIABILITY COMPANY

One West Fourth Street
Winston-Salem, NC 27101

Telephone: (336) 721-3600
Fax: (336) 721-3660
Web site: www.wcsr.com

John F. Morrow, Jr.
Direct Dial: (336) 721-3584
Direct Fax: (336) 733-8429
E-mail: jmorrow@wcsr.com

December 19, 2002

***VIA FACSIMILE (513-762-0006)***

James F. McCarthy, III, Esquire
Katz, Teller, Brant & Hild
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202

> Re:     ***Vision Gaming & Technology, Inc. v. Pace-O-Matic, Inc., Michael R. Pace and
> Christopher Cummings – 02CV166-J***

Dear Jim:

To follow-up on our conversation of yesterday, this letter should confirm that my clients consent to a 15-day extension of time for your clients to respond to our first set of discovery requests. Also, per our discussion, please send a proposed protective order at your earliest convenience. Finally, we still await the settlement proposal you promised several weeks ago and again yesterday.

Very truly yours,

John F. Morrow, Jr.

JFM/lhh

**EXHIBIT**

B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

VISION GAMING & TECHNOLOGY, INC.,    )
                                     )
              Plaintiff,             )
                                     )
       v.                            )        Civil No. 02-CV-166D
                                     )
PACE-O-MATIC, INC., MICHAEL R.       )
PACE, and CHRISTOPHER CUMMINGS,      )
                                     )
              Defendants.            )
_____)

### DEFENDANTS' FIRST REQUEST FOR PRODUCTION
### OF DOCUMENTS TO PLAINTIFF

Defendants Pace-O-Matic, Inc., Michael R. Pace and Christopher Cummings ("Pace"), through counsel and pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, requests that Plaintiff Vision Gaming & Technology, Inc. ("Vision Gaming"), produce a copy of each document identified herein and identify each document produced by the paragraph number of this Request pursuant to which the document is being produced, and that such production be made by serving a copy of each such document upon the undersigned within thirty (30) days after service of this Request. This Request shall be deemed to be continuing so as to require you to supplement your response to each Request below.

### INSTRUCTIONS

1.     You should answer each and every request separately and fully, including each subdivision thereof, unless it is objected to, in which event the reason for all objections shall be specifically and separately stated.

EXHIBIT

C

2.    Where a complete answer to a request is not possible, the request shall be answered to the extent possible and a statement shall be made indicating why only a partial answer is given.

3.    If the identification of any document or thing is withheld under a claim of privilege, please furnish a list signed by the person supervising your response identifying each document for which the privilege is claimed, together with the following information with respect to each such document:

    a.    The identity of the person who signed or authored the document;

    b.    The identity of all persons to whom the document was directed and/or received;

    c.    The nature and substance of the document with sufficient particularity to enable the court and the parties to identify the document;

    d.    The date of the document;

    e.    The identity of each person who has custody or control over the document;

    f.    The identity of each person to whom copies of the document were furnished together with his or her job title at the time each document was obtained;

    g.    The number of pages in the document;

    h.    Whether any non-privileged material is included in the document;

    i.    A description of any attachments to the document and an indication of whether such attachments are also privileged; and

    j.    The basis on which any privilege is claimed.

2

4.    If any "communication," "conversation" or "statement" is withheld under a claim of privilege, please furnish a list signed by the person supervising your response identifying each such communication, conversation or statement for which the privilege is claimed together with the following information:

    a.    The date of such conversation, communication or statement;

    b.    The place at which it occurred and the medium involved;

    c.    The identity of each person involved and/or present together with his or her job title at the time of the communication;

    d.    The subject matter and nature of the conversation, communication or statement;

    e.    The basis on which the privilege is claimed; and

    f.    Whether any non-privileged matter was contained in the conversation, communication, or statement.

## DEFINITIONS

For purposes of this Request for Production of Documents, the following terms shall have the meaning set forth below:

1.    "Plaintiff" or "Vision Gaming" refers to plaintiff Vision Gaming & Technology, Inc., all parents, subsidiaries and affiliates thereof; all divisions, predecessors, successors and assigns of each of the foregoing; and all officers, directors, employees, agents, consultants, attorneys and all other persons acting or purporting to act on behalf of or under the control of each of the foregoing.

2.    "Defendants" or "Pace" refers to defendants Pace-O-Matic, Inc., Michael R. Pace and Christopher Cummings, all parents, subsidiaries and affiliates thereof; all divisions,

3

predecessors, successors and assigns of each of the foregoing; and all officers, directors, employees, agents, consultants, attorneys and all other persons acting or purporting to act on behalf of or under the control of each of the foregoing.

3.       "Person" means any individual natural person, corporation, proprietorship, partnership, incorporated or unincorporated association, company, joint venture, trusts or estates, marital community and/or any other legal, commercial or governmental entity.

4.       "Document" is used in its customary broad sense to include (by way of illustration only and not by way of limitation) the following items, whether written, recorded or graphic matter, however produced or reproduced, and whether original, copies or drafts thereof: correspondence, telegrams, telecopies, facsimiles, memoranda, reports, notes, receipts, summaries, notices, labels, minutes, logs, calendar notes, contracts, schedules, agreements, books, records, vouchers, diaries, checks, computer print-outs, summaries or records of telephone conversations, photographs, brochures, pamphlets, advertisements, circulars, information stored in any data storage medium (including tapes, disks and computer hard drives), data processing or word processing system (in whatever form), electronic mail (including archived or backup copies), card files, press clippings, newspapers or newsletters, sworn or unsworn statements, lists, affidavits, court papers, appointment books, written reports or opinions of investigators or experts, questionnaires, illustrations, worksheets, information and investigation requests, and tape recordings.  Any document bearing on any sheet, or side thereof, any marks (including without limitation initials, stamp indicia, comments, or notations of any character) and not a part of the original text, or any reproduction thereof, is to be considered a separate document.  If any document must be decoded, deciphered, unencrypted or converted in order to make the document

4

understandable or comprehensible, any such programming, information code, cipher, conversion utility or data programming material should be considered to be part of the document.

5.   The term "identify," "identity," or "identification," when used in a reference to an individual, means to state his or her:

a.   Full name;
b.   Present or last known address;
c.   Present or last known employer; and
d.   Position and title as it relates to the subject of the Interrogatory being answered.

6.   The terms "identify," "identity," or "identification," when used in reference to firm, partnership, incorporated or unincorporated association, or other legal or commercial entity means to state:

a.   Its name;
b.   Its nature, e.g., firm, partnership, profit making corporation, fraternal association, etc.;
c.   Its present or last known address and telephone number;
d.   If incorporated, licensed or otherwise registered as required by law, the place of incorporation, licensing, or other registration, e.g., city, state, province, etc.; and
e.   Its present or last known principal place of business.

7.   "Referring or relating to" means in whole or in part relating to, referring to, constituting, containing, concerning, embodying, discussing, reflecting, dealing with, analyzing, pertaining to or any way relevant within the meaning of Rule 26 of the Federal Rules of Civil Procedure.

## DOCUMENT REQUESTS

1.   All documents referring or relating to any licenses, assignments, or transfers of intellectual property rights from Leisure Time Technology or Leisure Time Casinos & Resorts to you.

**RESPONSE:**

2.    All prosecution files and related documents for any trademark applications (including applications and drafts thereof) for the mark Pot-O-Gold.

**RESPONSE:**

3.    Copies of all copyright registrations and pending copyright registration applications pertaining to Pot-O-Gold software, including copies of all materials sent to the Copyright Office with such applications (including, but not limited to deposit materials), and all materials sent by the copyright office to you in response to your submissions.

**RESPONSE:**

4.    All documents referred to or relied upon by you in drafting the complaint in this action, or in preparing responses to Defendants' interrogatories.

**RESPONSE:**

6

5.    All documents evidencing current and past ownership, including assignment, licensing or otherwise transfer thereof, of the intellectual property at issue in this litigation, including, but not necessarily limited to, any trademarks, copyrights, or trade secrets associated with Pot-O-Gold.

**RESPONSE:**

6.    Copies of all published or non-published articles discussing Vision, Vision's work force, or Vision's software/gaming development capabilities.

**RESPONSE:**

7.    Copies of the actual trade secrets that are at issue (to the extent they are encompassed in any written documentation).

7

**RESPONSE:**

8.    All documents evidencing, referring or relating to any communications you have had with persons/entities other than Defendants concerning Defendants or the subject matter of this litigation.

**RESPONSE:**

9.    Documents sufficient to identify all U.S. parent, subsidiary, affiliated and/or related companies of Vision.

**RESPONSE:**

10.    All documents relating or referring to the facts and circumstances surrounding the date of first use (and if unknown, the date of first known use) of Vision's Pot-O-Gold mark in the United States.

**RESPONSE:**

8

11.   All documents relating to or referring to consent, authorization or permission to use Vision's Pot-O-Gold mark or software, including but not limited to licenses, agreements and assignments.

**RESPONSE:**

12.   All documents relating or referring to any consent agreements and security agreements involving Vision's Pot-O-Gold mark or software.

**RESPONSE:**

13.   Documents sufficient to identify each product sold or offered for sale under any trademark(s) incorporating the word Pot-O-Gold by or under license from Vision in the United States.

**RESPONSE:**

9

14. Two (2) examples of each use by Vision of "Pot-O-Gold" as a trademark and/or as a component of a trademark in the United States, including but not limited to: advertisements, advertising mockups, brochures, catalogues, circulars, leaflets, direct mail pieces, newspaper and magazine advertisements, commercials, telephone book advertisements, price lists, trade association listings, annual reports, proposals and promotional materials, packaging, packaging inserts, labels, point of sale displays and catalogs, and Internet web page(s) and/or site(s).

**RESPONSE:**

15. All documents concerning research conducted by or on behalf of Vision directed to or showing aided and/or unaided brand awareness of the Pot-O-Gold mark in the United States.

**RESPONSE:**

10

16. All documents concerning research conducted by or on behalf of Vision concerning any products sold and/or proposed to be sold or considered for sale under the Pot-O-Gold mark in the United States.

**RESPONSE:**

17. Documents sufficient to identify each channel of trade through which Vision sells or distributes products under the Pot-O-Gold mark in the United States.

**RESPONSE:**

18. Documents sufficient to identify all products sold under the Pot-O-Gold mark in the United States, from January 1, 1997 to date, by:

    a. designation (*e.g.*, style, model, classification and/or model number);

    b. number of units sold;

    c. number of purchasers; and

    d. retail price range.

**RESPONSE:**

11

19.    All documents that evidence actual confusion with Vision, in the United States, with respect to the source or sponsorship of products sold or offered for sale by Vision under the Pot-O-Gold mark, including but not limited to misdirected mail and inquiries as to affiliation.

**RESPONSE:**

20.    All documents concerning unsolicited communications mentioning or referring to the Pot-O-Gold mark received from purchasers or potential purchasers of goods under the Pot-O-Gold mark, other than purchase orders.

**RESPONSE:**

21.    All documents concerning any instances of confusion between Plaintiff and Defendants.

**RESPONSE:**

12

22.    Document sufficient to identify all newspapers, magazines and/or any other publications distributed in the United States in which you have marketed products under the Pot-O-Gold mark.

**RESPONSE:**

23.    All annual reports and financial statements of Vision from 2000 forward.

**RESPONSE:**

24.    All documents relating to or referring to any likelihood of confusion, mistake or deception between products sold by Vision and Pace-O-Matic.

**RESPONSE:**

13

25.    All documents filed with the Court in any bankruptcy action involving Vision, Leisure Time Technology, or Leisure Time Casinos & Resorts, and all deposition or hearing transcripts from any such proceeding.

**RESPONSE:**

26.    All documents, including but not limited to market research reports and customer profiles, sufficient to identify the demographics of purchasers of Vision's products sold under the Pot-O-Gold mark.

**RESPONSE:**

27.    All documents relating or referring to any action taken by Defendant to protect Defendant's Pot-O-Gold mark or software, including but not limited to letters, telephone calls, lawsuits, oppositions, cancellations and any other *inter partes* proceedings.

**RESPONSE:**

14

28.    All documents referencing Defendants from January 1, 1998 forward.

**RESPONSE:**

29.    All employment files for Defendant Cummings.

**RESPONSE:**

30.    All documents referred to or relied upon by you in responding to Defendants' interrogatories.

**RESPONSE:**

31.    All documents referring or relating to, or comprising Vision's customer lists, prospective customer lists, and mailing lists for products offered and sold under the Pot-O-Gold mark.

**RESPONSE:**

32.    All documents regarding the types and classes of consumers to whom, and the markets and channels of trade in the United States through which Vision markets or sells, or intends to market or sell goods identified by Pot-O-Gold, including without limitation all documents indicating the channels of commerce through which Vision offers and sells its goods to consumers, and including without limitation all documents indicating the manner in which orders are solicited for Vision's goods marketed or sold under the Pot-O-Gold mark.

**RESPONSE:**

33.    All documents referring or relating to or comprising any opinion from counsel, whether or not such counsel was employed by Vision, concerning Vision's right to the Pot-O-Gold trademark, the validity/invalidity of that trademark, or the infringement/non-infringement of that trademark, including without limitation all documents identifying the date of any such opinion and the attorney rendering the opinion, or discussing any action Vision may have taken, or considered taking, in reliance upon said opinion.

**RESPONSE:**

16

34.    All documents referring or relating to, or comprising, any plan Vision has to expand the type of goods it offers for sale under the Pot-O-Gold mark.

**RESPONSE:**

35.    All documents regarding Vision's policy with respect to retention of documents, including business records.

**RESPONSE:**

36.    All documents referring or relating to pricing decisions, sales forecasts, business plans, product strategies, projections, fiscal plans, or budgets relating to products sold or marketed under the Pot-O-Gold mark.

**RESPONSE:**

17

37.    All documents and things summarizing, or from which a summary could be prepared if one is not available, annually from the date of first use to the present, the volume, revenue, and location(s) of all sales of goods under the Pot-O-Gold mark.

**RESPONSE:**

38.    All documents and things summarizing, from which a summary could be prepared if one is not available, annually from the date of first use to the present, the amount expended to advertise and promote goods under or in connection with the Pot-O-Gold mark.

**RESPONSE:**

39.    All documents and things referring or relating to any allegation of infringement or dilution between the Pot-O-Gold mark and any mark of another.

**RESPONSE:**

18

40.    All documents received from customers, including but not limited to, claims or complaints and letters involving, concerning, or relating to goods sold under the Pot-O-Gold mark.

**RESPONSE:**

41.    To the extent not covered elsewhere in these requests, all documents and things describing or instructing as to Vision's procedure for using its trademarks.

**RESPONSE:**

42.    All documents referring or relating to any analysis comparing Vision's goods offered under the Pot-O-Gold mark with the goods of any other person.

**RESPONSE:**

19

43. To the extent not covered elsewhere in these requests, all documents and things relied upon by Vision to support any contention that the Pot-O-Gold trademark has not been abandoned.

**RESPONSE:**

44. To the extent not covered elsewhere in these requests, all documents upon which Vision relies to support any contention that the Pot-O-Gold mark has acquired distinctiveness.

**RESPONSE:**

45. All documents and things referring or relating to any communication between Vision and/or Mr. Hilliou and any other person about Defendants or the subject matter of this proceeding, from January 1, 2000 forward.

**RESPONSE:**

20

46.   For each good sold under the Pot-O-Gold mark, the following:

(a)   Income statements;

(b)   Balance sheets;

(c)   Cash flow statements;

(d)   Accounting notes;

(e)   Periodic reports (e.g., monthly, quarterly, and annual financial statements and reports);

(f)   Planning reports;

(g)   Costs estimates; and

(h)   Projections and forecasts.

**RESPONSE:**

47.   Any and all internal correspondence, e-mail, memoranda or other documents in which any of your employees, directors or principals discussed the subject matter of the allegations contained in the Complaint.

**RESPONSE:**

21

48.    Documents sufficient to show any efforts you have taken to maintain the secrecy of any trade secrets in issue, including, but not limited to, security procedures, employee agreements, and non-disclosure agreements.

**RESPONSE:**

49.    Documents sufficient to identify all publicly available data regarding the information or technology encompassed by the trade secrets you claim have been misappropriated.

**RESPONSE:**

50.    Separately, with respect to each of the alleged trade secrets listed in response to Defendants' first set of interrogatories, produce all documents that specifically identify each alleged trade secret, and documents sufficient to show use of the alleged trade secret.

**RESPONSE:**

51.    Separately, with respect to each of the alleged trade secrets listed in response to Defendants' first set of interrogatories, produce documents sufficient to show (a) who created the alleged trade secret; (b) the date the alleged trade secret was created; (c) each of the commercial products in which the alleged trade secret has ever been used; and (d) the date of release for each of the commercial products in which the alleged trade secret has been used.

**RESPONSE:**

52.    All documents that refer or relate to any instances where any of the alleged trade secrets identified in response to defendants' first set of interrogatories were disclosed to someone without an obligation of confidentiality, were published or were reverse engineered (including, without limitation, all publications, speeches, presentations, or models in which any of the alleged trade secrets have appeared or been referred to).

**RESPONSE:**

23

53.    All documents that refer or relate to whether Defendants have misappropriated any of the alleged trade secrets identified in your response to Defendants' first set of interrogatories.

**RESPONSE:**

54.    Any and all documents which relate to your claims that you have been damaged as a result of Defendants' conduct as alleged in the Complaint.

**RESPONSE:**

55.    Any and all material prepared by an expert or for an expert in anticipation of the expert's trial and deposition testimony, including all material prepared by a consulting expert if the consulting expert's opinion or impressions have been reviewed by a testifying expert.

**RESPONSE:**

24

56.    All documents pertaining to any changes made to the Pot-O-Gold software.

**RESPONSE:**

57.    All documents referring or relating to the cessation of Mr. Cummings employment with Vision.

**RESPONSE:**

58.    Copies of any published or unpublished articles in which any of your current or former employees are interviewed in connection with the topics of gaming software or equipment.

**RESPONSE:**

60.    All documents referring or relating to Leisure Time's or your ability or inability to obtain licenses in gaming jurisdictions, including, but not limited to, Arizona.

**RESPONSE:**

25

61.    All documents referring or relating to assignments or licenses of intellectual property rights between you or Leisure Time and Alan Johnson.

**RESPONSE:**

62.    All documents filed in, and all transcripts resulting from, your or Leisure Time's litigation/adversarial claims against Alan Johnson.

**RESPONSE:**

63.    All documents referring or relating to transfers of intellectual property between Leisure Time Technology and Leisure Time Casinos and Resorts.

**RESPONSE:**

64.    All documents referring or relating to any valuations conducted by or for you for any of the intellectual property at issue in this litigation.

**RESPONSE:**

26

65.    All documents referring or relating to any security interests held by others (including, but not limited to, Merrill Lynch) in intellectual property purportedly owned by you.

**RESPONSE:**

66.    All business plans provided by you or Leisure Time to The Crystal Group for use in determining the price and structure of the bankruptcy reorganization plan between The Crystal Group and Leisure Time.

**RESPONSE:**

67.    All documents referring or relating to any analysis or investigation undertaken by you prior to filing suit to determine that Defendants infringed your purported POT-O-GOLD software.

**RESPONSE:**

This the 15th day of November, 2002.

27

_____
John F. Morrow, Jr.

OF COUNSEL:

Mark N. Poovey
Randy S. Springer
John F. Morrow, Jr.
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One West Fourth Street
Winston-Salem, NC  27101
Telephone:     (336) 721-3584

Andrea Richard
ROTHGERBER JOHNSON & LYONS, LLP
One Pioneer Center
2424 Pioneer Avenue, Suite 210
Cheyenne, Wyoming  82001-3076
Telephone:     307-638-6262

                              Attorneys for Defendants

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an attorney at law licensed to practice in the State of Wyoming, is an attorney for defendant and is a person of such age and discretion as to be competent to serve process.

That on November 15, 2002, he served a copy of the attached **DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF** by placing said copy in a postpaid envelope and addressed to the person(s) hereinafter named, at the place(s) and address(es) stated below, which is/are the last known address(es), and by depositing said envelope and its contents in the United States Mail.

ADDRESSEE(ES):

Gary R. Scott
Hirst & Applegate
Post Office Box 1083
Cheyenne, WY  82003-1083

James F. McCarthy, III
Katz, Teller, Brant & Hild
2400 Chemed Center
255 East Fifth Street
Cincinnati, OH  45202-4787

John F. Morrow, Jr.

29